*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re NORTON/BARKER, Minors.

UNPUBLISHED
June 23, 2022

No. 359044
Genesee Circuit Court
Family Division
LC No. 18-135468-NA

Before: RONAYNE KRAUSE, P.J., and M. J. KELLY and YATES, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to the minor children JN and LB, pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood of harm if returned to parent).[1]  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

In October 2018, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court remove JN and LB from respondent's home and authorize the petition.  The petition included allegations that respondent physically abused JN, including beating him with a belt and kicking him, resulting in extensive bruising, and withholding food as a punishment.  The petition further alleged that respondent did not have adequate housing. Respondent pleaded no contest to the allegations in the petition regarding her lack of adequate housing.  The trial court adopted DHHS's recommended case service plan, which required respondent to maintain regular contact with DHHS, establish and maintain suitable housing, establish and maintain a legal source of income, sign all documentation, complete a psychological

---

[1] JN's legal father could not be located after a diligent search, and as a result, the trial court terminated the parental rights of all known and unknown fathers of JN in this action.  LB's legal father was also a respondent in this action for a period of time; however, a separate petition was filed to terminate his parental rights, and he is not a party to this appeal.

evaluation and follow all recommendations from this evaluation, complete counseling services, and complete parenting education classes.

Pursuant to an emergency safety plan agreed upon by respondent and Child Protective Services (CPS), the children were initially placed with respondent's godmother, CB, with whom the children were very close. When CB was recovering from surgery, JN was temporarily placed elsewhere and was placed back with CB after she recovered; however, LB was placed with a paternal relative for the duration of the trial court proceedings.

Respondent participated in some services, but petitioner ultimately concluded that she had not made progress. DHHS filed a supplemental petition in January 2021, requesting termination of respondent's parental rights. JN's foster care caseworker testified that respondent was referred to counseling, and that she attended counseling with a therapist, but her therapy was later terminated because of lack of attendance and lack of engagement. Respondent did complete a psychological evaluation, but she did not complete the recommendation from that evaluation that she continue to attend therapy. Respondent's therapist also referred respondent to therapy at Genesee Health Services (GHS), but respondent did not inform her caseworkers that she completed intake or attended therapy there. Respondent also was in the psychological ward of a hospital for a week because of mental health concerns, and she received therapy while she was there. At the time of the termination hearing, respondent was receiving case management services at the HOPE Network and she had a psychiatrist, but she was on a long waitlist for therapy.[2] Respondent was receiving medication to treat her bipolar disorder and schizophrenia. However, respondent never provided her caseworker with her medication to verify this. Respondent inconsistently took her prescribed medications, believing she did not need them, and she admitted that she had only started taking them consistently "maybe two months ago."

JN's caseworker also testified that although respondent completed two parenting classes, respondent was terminated from several other programs, including the supportive visitation program and the parent supportive partner program, for lack of engagement and an altercation between respondent's family[3] and the program facilitator. Regarding respondent's parenting time, respondent missed 43 out of 81 parenting visits throughout the lower court proceedings.

---

[2] It appears there was some confusion about whether respondent's treatment with the psychiatrist constituted therapy. One foster care caseworker opined that the psychiatrist was not a therapist, whereas another foster care caseworker believed that the psychiatrist *was* a therapist and testified that she had only recently been informed otherwise. Conversely, a mental health case manager at HOPE Network testified that the psychiatrist was, in fact, one of the two therapists on staff and so respondent's sessions with the psychiatrist constituted counseling sessions. Respondent's testimony was unclear but suggested that she believed the mental health case manager was her therapist. The foster care case manager opined that respondent should have known otherwise, because case notes reflected that respondent had asked the case manager about needing a therapist.

[3] The nature of the altercation was not clearly described, but it entailed CB having initially allowed respondent to visit the children in her own home, subject to the condition that respondent not bring other people. However, respondent "constantly" did bring other members of her family, who were angry and aggressive and made CB feel unsafe when they tried to get into her home.

Respondent never physically hit her children during parenting time visits; however, several issues arose during respondent's parenting time. Respondent frequently had inappropriate conversations with JN, making promises she could not or did not keep. For example, respondent promised JN a bike, that she would bring him home soon, and that she would bring him cupcakes for his birthday. Respondent did not follow through on these promises; and following the latter promise, JN waited outside for respondent for the entire day. As a consequence of the breached promises, in addition to JN's ADHD and other special needs, JN engaged in behavioral issues and self-harm. Meanwhile, respondent regarded her failure to provide the cupcakes as promised as no big deal. JN's caseworker ultimately believed that JN would suffer psychological harm if placed in respondent's care, and that it was in the children's best interests to terminate respondent's parental rights.

JN's caseworker also testified that respondent never had adequate housing. During the proceedings, respondent moved frequently between hotels, family members' homes, and apartments. A home visit was performed at one of respondent's apartments, but this apartment was not suitable for children because of safety hazards. Respondent also provided her caseworker with a lease for an apartment, but the caseworker discovered respondent had forged the lessor's signature on the lease. At the time of the termination hearing, respondent was living with her sister. This housing was also inadequate because respondent's sister had five children and was on the CPS registry due to a prior CPS case that was closed at the time of the termination hearings.

LB's caseworker testified that she believed respondent and the children had a bond, but it was more of a "playmate bond." Respondent testified that she did not consistently take her medication for her bipolar disorder and her schizophrenia. Respondent also was taking anger management classes, but she did not inform her caseworker or provide proof that she was taking these classes. Further, respondent admitted to hitting JN with a belt "[t]en times across the butt."

After the close of proofs, the trial court concluded that (1) although DHHS's referrals may have been "lacking" toward the end of the case, overall, DHHS made reasonable efforts to provide services to respondent, but she failed to engage in services, (2) petitioner had established statutory grounds for termination pursuant to "each of the statutorily plead basis [sic]" in the supplemental petition,[4] and (3) termination was in the children's best interests.

---

[4] In the supplemental petition, petitioner alleged that termination was warranted under MCL 712A.19b(3)(a)(*i*), (a)(*ii*), (b)(*i*), (c)(*i*), (g), (j) and (k)(*i*). The trial court, in its findings regarding respondent-mother, did not cite any of the above subparagraphs, but only mentioned statutory language from subparagraph (c), and stated that "there's been a showing by clear and convincing evidence that each of the statutorily pleaded bases have been shown by the prosecuting attorney." This was erroneous, because subparagraphs (a)(*i*), (a)(*ii*), and (k)(*i*) were, in fact, pleaded and were not applicable to respondent-mother because there was no evidence she abandoned her children. These subparagraphs were applicable only to all known and unknown fathers of JN. On appeal, the parties agree that termination of respondent-mother's parental rights was ordered under subparagraphs (c)(*i*), (g), and (j); neither party mentions subparagraph (b)(*i*), even though it appears the evidence would support a finding of statutory grounds under (b)(*i*). Nevertheless,

## II. STANDARDS OF REVIEW

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). The trial court's factual findings and its determination that statutory grounds for termination of parental rights exist are reviewed for clear error. *In re Mason*, 486 Mich 142, 152; 782 NW2d 757 (2010). "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). The best interests of the child need only be established by a preponderance of the evidence on the whole record. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). We review a trial court's determination of best interests for clear error. *In re Sandborn*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354915); slip op at 10. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

Generally, a trial court's findings regarding reasonable efforts are also reviewed for clear error. See *In re Fried*, 266 Mich App 535, 541-543; 702 NW2d 192 (2005). However, respondent did not challenge the sufficiency of the services offered when her service plan was adopted, and therefore, any challenge to the adequacy of the service plan itself is not preserved.[5] *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012) (quotation marks and citation omitted). Unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). To establish plain error, a respondent must "establish that (1) error occurred; (2) the error was plain, i.e., clear or obvious; and (3) the plain error affected their substantial rights. And the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *In re Ferranti*, 504 Mich 1, 29; 934 NW2d 610 (2019) (quotation marks, citations, and alterations omitted).

## III. REASONABLE EFFORTS

Respondent argues that DHHS failed to make reasonable efforts to avoid terminating her parental rights because it did not make additional referrals for a therapist, did nothing to help respondent obtain a new therapist after respondent stopped receiving therapy, negligently assumed she was receiving therapy when she was actually on a waitlist to receive therapy, and failed to

---

given these overall circumstances and the agreement between the parties regarding the statutory grounds on which the court relied, we will assume for purposes of this appeal that termination of respondent-mother's parental rights was ordered under only subparagraphs (c)(*i*), (g), and (j).

[5] Our Supreme Court implied that a mechanical application of this rule may be inappropriate under circumstances where deficiencies in a service plan could not reasonably have been detected at the outset. See *In re Hicks*, 500 Mich 79, 89 n 9; 893 NW2d 637 (2017). However, respondent appears to challenge the implementation of her service plan, rather than the design of the plan, so we do not believe the criticism discussed in *Hicks* is applicable here. Conversely, we do not believe the rule precludes respondent from arguing that petitioner did not uphold its end of the deal.

provide her with additional mental health services to assist her with time management and coping mechanisms. We disagree.

"Reasonable efforts to reunify the child and family must be made in *all* cases absent aggravated circumstances." *In re Smith-Taylor*, ___ Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 163725); slip op at 1 (quotation marks and citation omitted, emphasis in original). "Reasonable efforts must include a service plan outlining the steps that both the Department and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id.* (quotation marks, citation, and alteration omitted). Even though DHHS has a responsibility to make reasonable efforts to provide services to reunify the respondent and the child, "there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Frey*, 297 Mich App at 248. To demonstrate that petitioner did not make reasonable efforts to reunify the family, respondent must demonstrate that she would have fared better had petitioner offered other services. See *Fried*, 266 Mich App at 543.

DHHS made reasonable efforts to provide mental health services to respondent. See *Smith-Taylor*, ___ Mich at ___; slip op at 1. At the start of her case, DHHS referred respondent for therapy. The therapist terminated respondent's therapy because of respondent's lack of attendance and failure to engage in the sessions she attended. The therapist determined respondent needed additional therapy and referred her to GHS for additional therapy. Further, respondent received some therapy in the psychological ward at the hospital for seven days. After respondent was discharged, respondent was asked by her caseworker if she was participating in therapy, but she never provided any information about whether or not she completed intake, at GHS or elsewhere, or that she was participating in therapy. In addition, respondent was not participating in therapy at the time of the termination hearings at the HOPE Network because she was on a waitlist. Clearly, respondent absolutely cannot be faulted for circumstances outside her control, such as whether any therapists are actually available. However, respondent's caseworker thought that respondent was receiving therapy at the HOPE Network through her psychiatrist, which was why additional referrals were not provided, and, given the HOPE Network case manager's testimony that the psychiatrist was in fact a therapist,[6] that misapprehension does not appear entirely unreasonable under the circumstances. Ultimately, respondent's historical failure to participate fully in therapy that was available to her, and her apparent failure to follow through with the numerous referrals provided to her for therapy after her therapy was terminated, show that she did not follow through with her responsibility to participate in the services offered. See *Frey*, 297 Mich App at 248.

Further, there was no evidence that respondent's case service plan was inadequately designed or incomplete. Respondent received not only therapy services, but also services to assist her with time management skills and coping mechanisms. This evidence demonstrates that DHHS made reasonable efforts to avoid termination and provide respondent with services throughout her case, see *Smith-Taylor*, ___ Mich at ___; slip op at 2, but that respondent failed to engage with services, see *Frey*, 297 Mich App at 248. Therefore, on the basis of this evidence, the trial court

---

[6] See footnote 2.

-5-

did not err by concluding that petitioner made reasonable efforts to reunify respondent and her children.

## IV. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred by finding clear and convincing evidence to terminate her parental rights because none of the statutory grounds were established. We disagree.

The trial court found, in relevant part, statutory grounds for termination established by clear and convincing evidence pursuant to MCL 712A.19b(c)(*i*). MCL 712A.19b(3)(c)(*i*) provides in relevant part:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds . . . the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination of parental rights pursuant to MCL 712A.19b(3)(c)(*i*) is proper when "the totality of the evidence amply supports that [the parent] had not accomplished any meaningful change in the conditions" that led to the trial court taking jurisdiction over the minor, *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009), and "there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age," MCL 712A.19b(3)(c)(*i*).

The conditions that led to adjudication were respondent's lack of suitable housing and her physical abuse of JN, which was addressed in her case service plan through services for her mental health issues and parenting classes. Respondent pleaded no contest to the allegation in the complaint regarding her lack of suitable housing. Respondent argues she made progress for months before the termination hearings and had addressed the issues that led to her children being placed in care because she had not physically disciplined her children in three years, had learned new parenting methods, visited her psychiatrist and took her medication regularly, had housing, had a steady income, and had received mental health services. We find the totality of the evidence supports the conclusion that even if respondent did make some efforts, ultimately respondent did not make any meaningful change or progress in obtaining suitable housing or in addressing her mental health issues, see *Williams*, 286 Mich App at 272-273, and there was no evidence she could do so within a reasonable amount of time considering the children's ages, MCL 712A.19b(3)(c)(*i*).

Respondent failed to obtain and maintain suitable housing, and she did not have suitable housing at any point during the trial court proceedings. During the trial court proceedings, respondent lived in a hotel with her then-boyfriend; lived with her then-girlfriend at her apartment; lived in an apartment that her caseworker determined was not suitable because of safety issues,

such as nails sticking out of the floor and the lack of a refrigerator; and lived in an apartment at which the landlord allowed respondent to reside under the condition that she would have to move if the property was sold. Further, at one point, respondent informed her caseworker she had an apartment, but her caseworker discovered the lease was forged. At the time of the termination hearings, respondent was living with her sister, which respondent's caseworkers had already explored as a housing option but determined it was not suitable for respondent and her children because of respondent's sister's prior CPS involvement and a lack of space. The trial court also made a similar conclusion.

The petition also alleged that respondent physically hit her son, JN, with a belt. According to respondent's service plan, respondent was required to attend parenting classes and complete a psychological evaluation and follow its recommendation to attend therapy. Although respondent attended parenting classes and never physically hit her children during visitation, she missed 43 out of 81 parenting visits throughout her case and had inappropriate conversations with her children that caused behavioral issues and emotional harm to JN. Further, respondent did not follow the recommendation from that evaluation that she attend therapy and failed to follow through with several referrals for therapy throughout her case. Respondent attended 18 therapy sessions; however, the therapist ultimately terminated respondent's therapy because respondent missed her last six sessions. The therapist concluded that respondent needed more therapy. Respondent was referred to GHS for therapy, but respondent never informed her caseworker whether she had completed intake or any services at GHS or elsewhere. Further, respondent attended anger management classes voluntarily toward the end of her case, but respondent had not completed these courses at the time of her termination hearings, and respondent did not provide proof to her caseworkers that she was taking these classes. Respondent was also taking medications at the time of her termination hearings for her bipolar disorder and schizophrenia, but admitted that she failed to take these medications consistently and had stopped taking these medications previously because she did not feel like she needed them.

In sum, since the original petition was filed in October 2018 through the final termination hearing in October 2021, respondent failed to accomplish any meaningful change in the conditions that led to the trial court's taking jurisdiction over the children. See *Williams*, 286 Mich App at 272-273. Therefore, the trial court did not err by concluding that there was no reasonable likelihood that the conditions would be rectified within a reasonable time considering the children's ages and that termination was appropriate pursuant to MCL 712A.19b(3)(c)(*i*). In light of our conclusion that termination was appropriate under MCL 712A.19b(3)(c)(*i*), we need not address the additional statutory grounds because only one statutory ground must be proven to terminate parental rights. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

## V. BEST INTERESTS

Respondent argues that the trial court erred by finding that termination of respondent's parental rights was in the children's best interests because the trial court failed to give the most weight to respondent's bond with the children, the trial court failed to acknowledge that respondent could provide stability to the children with the support from her family, and there was no evidence the children would be better off living with their placements. We disagree.

When determining whether it is in the best interests of the child to terminate respondent's parental rights, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). In making a best-interests determination, the trial court may consider several factors, including "[t]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Sandborn*, ___ Mich App at ___; slip op at 11 (quotation marks and citation omitted). In addition, the trial court may consider "the child's age, inappropriate parenting techniques," the parent's visitation history, the parent's compliance with treatment plans, the child's well-being while in care, and the child's possibility of adoption. *Id*.

The trial court found that it was in the children's best interests for respondent's parental rights to be terminated because the children needed "stability and permanence." The trial court relied on the fact that the children were bonded with their placement, and that this home provided them with stability and safety.[7] The trial court also considered respondent's lack of progress, lack of stability, and lack of benefit from the services offered over the "lengthy" period of time given by the trial court. Finally, the trial court considered the fact that respondent's caseworker and CB believed it was in the children's best interests to terminate respondent's parental rights.

Furthermore, the trial court properly considered the bond between respondent and her children. See *Sandborn*, ___ Mich App at ___; slip op at 11. That the trial court did not give the most weight to respondent's bond with her children is not sufficient grounds for reversal because this was only one factor that the trial court could weigh. See *Olive/Metts*, 297 Mich App at 41-42. The trial court also properly considered respondent's inappropriate behavior during parenting time, respondent's poor attendance at parenting time, respondent's inability to provide permanent and stable housing, respondent's inability to resolve her mental health issues, respondent's failure to take her medication, and respondent's overall noncompliance with her case service plan. See *Sandborn*, ___ Mich App at ___; slip op at 9-10. The trial court also permissibly considered the advantages of the children's placements, see *id*., including the children's bond with their foster placement, and the foster placement's familiarity with the children's special needs, such as JN's behavioral issues and LB's hearing loss. Although the trial court only considered the children's bond and well-being with CB, LB also had a bond with her paternal relative placement. Contrary to respondent's argument, there was no evidence that the financial status of the foster parents was better than respondent's, or that the trial court considered this in its decision.

Examining the record as a whole, respondent's failure to comply with her case service plan, the children's need for permanency and stability, and the children's bond with their placement

---

[7] The trial court indicated that the children were in the same placement at the time of the termination hearing, which was incorrect. As stated previously, JN and LB were in separate placements at the time of the termination hearings; JN was placed with CB, and LB was placed with a paternal relative. Nevertheless, there was evidence that each child was bonded with their respective placements and that each placement was indeed safe and stable, so on the basis of the whole record, *White*, 303 Mich App at 713, we cannot conclude that the trial court's mistake was significant.

outweighed the bond shared by respondent and the children. Therefore, the trial court did not err by finding that the termination of respondent's parental rights was in the children's best interests.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Kelly
/s/ Christopher P. Yates